IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. TIMOTHY R. MULRENIN,
6. **WILLIAM VINCENT KANTOLA**,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS, and
10. RICKIE PATTERSON BLAKE,

    Defendants.

---

# DEFENDANT WILLIAM KANTOLA'S MEMORANDUM
# IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL

---

COMES NOW, Defendant William Kantola, by and through his undersigned counsel, and submits this Memorandum in support of his motion under Rule 29(a) of the Federal Rules of Criminal Procedure for this Court to enter a judgment of acquittal.

## I.    INTRODUCTION

Mr. Kantola is charged in one count of the Superseding Indictment with violating Section One of the Sherman Act, 15 U.S.C. § 1, for allegedly participating in an agreement to fix prices and rig bids over a seven-year plus period. The Government has utterly failed to prove its case

because it did not and cannot provide the requisite evidence of (1) what Mr. Kantola did or did not do; (2) what he understood; and (3) what he intended.

## II.  LEGAL STANDARDS

### A.  RULE 29 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

The Tenth Circuit "permit[s] the [district] court to enter a judgment of acquittal only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982). "While undoubtedly deferential, this review has some bite: if the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty, we will reverse the conviction." *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015) (citations omitted). "While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable." *Id.*

### B.  SHERMAN ACT SECTION ONE

#### i.  ELEMENTS OF THE OFFENSE

Section One of the Sherman Act prohibits "contract[s], combination[s], or conspirac[ies], in restraint of trade or commerce." 15 U.S.C. § 1. This language only prohibits unreasonable restraints of trade.[1] *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (collecting cases). "The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir.

---

[1] The Government cannot rely on a price-fixing label to prove that the alleged restraint is unreasonable or undue. *National Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141, 2160(2021) (analyzing horizontal price-fixing under the rule of reason and requiring fact-finding on the issue of whether a restraint is unreasonable); *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23-24 (1979) (same).

2006). "The crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal citation omitted). To prove that a conspiracy existed, the evidence must show that the alleged members of the conspiracy came to an agreement or mutual understanding to accomplish an unlawful purpose. *United States v. Metro. Enters., Inc.*, 728 F.2d 444, 450-51 (10th Cir. 1984). An information exchange alone does not fall into the category of restraints considered *per se* offenses. *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999); *United States v. SuntarRoofing, Inc.*, 897 F.2d 469, 475 (10th Cir. 1990).

The Government must also prove the element of intent beyond a reasonable doubt for each individual. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 (1978) ("[I]ntent is a necessary element of a criminal antitrust violation.") "An alleged conspirator . . . lacks the requisite criminal intent if he does not know the conspiracy's objective; this knowledge must be shown by clear, unequivocal evidence." *United States v. Anderson*, 981 F.2d 1560, 1563(10th Cir. 1992) (citations and quotation marks omitted); *United States v. Rahseparian*, 231 F. 3d 1257, 1262 (10th Cir. 2000); *Metro. Enters.*, 728 F.2d at 453. Evidence of intent must be evidence of an intent to join and to effectuate an agreement, not merely to raise prices, increase profits, or understand competitor positions. *Gypsum*, 438 U.S. at 443 n.20.

### ii. RESTRICTIONS ON PERMISSIBLE INFERENCES

Antitrust law limits the range of permissible inferences in antitrust cases to prohibit drawing the inference that price fixing has occurred from evidence that is consistent with ordinary behavior. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986) (impermissible to draw inference of price-fixing conspiracy when "conduct is consistent with other, equally plausible explanations"). Further, "a conviction must be grounded in more

than a mere suspicion of guilt when viewing the evidence in its entirety." *United States v. Hill*, 786 F.3d 1254, 1261 (10th Cir. 2015). The government may use circumstantial evidence to fulfill this burden, and the jury may draw *reasonable* inferences from circumstantial evidence, but "an inference must be more than speculation . . . to be reasonable . . . . A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such [an inference] is infirm because it is not based on the evidence." *Id.* at 1261-62 (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)). Moreover, the Tenth Circuit further limits inferences that can be drawn in conspiracy cases involving underlying conduct that is not presumptively unlawful. *See United States v. Carnagie*, 533 F.3d 1231, 1239 n.5 (10th Cir. 2008) ("[B]ecause the underlying transaction is generally lawful, one cannot infer an illegal common purpose in the same way that a common purpose could be found in a drug conspiracy. Instead, interdependence must be proved more precisely. The government must do more than prove that a defendant [communicated with a commercial competitor] to demonstrate interdependence; it must show that each defendant's actions benefitted the common venture.") Finally, and most importantly, the Court "cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference." *United States v. Funez*, 13-CR-00160, 2014 WL 3707991, at *12 (D. Colo. July 25, 2014) (quoting *United States v. Hernandez,* 509 F.3d 1290, 1295 (10th Cir. 2007)). Instead, the Court "must be mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement." *Id.* (citation omitted).

### III. INSUFFICIENCY OF THE EVIDENCE FOR A REASONABLE JURY TO FIND BEYOND A REASONABLE DOUBT THAT DEFENDANT KANTOLA IS GUILTY

#### A. FAILURE OF PROOF THAT A CONSPIRACY EXISTED

Not a single witness testified that he or she entered into an agreement with Mr. Kantola to fix prices or rig bids at any time. Similarly, no witness testified to knowledge of the purported seven-year plus price-fixing conspiracy alleged by the government. Mr. Robert Bryant, the government's only percipient witness, did not even know of any price *sharing* prior to 2014.[2]

Likewise, not a single document provides direct evidence of the alleged agreement. In this vacuum of direct evidence and in desperation, the Government has asked the jury to draw inference upon inference to show that a conspiracy existed, pointing to both phone calls of unknown substance between competing suppliers and internal supplier documents reflecting competitor information. The Government asks the jury to *infer*, first, that competitors exchanged information with each other on those phone calls, and, second, that this information sharing was pursuant to an agreement to fix prices and rig bids. The evidence, however, makes these inferences implausible to the point of prohibited speculation. The evidence is clear: competing suppliers were often expected to, and did, communicate with each other on a regular basis for numerous legitimate business reasons. *See, e.g.*, Ledford (11/9/2021 TR 99-11, 102:2-25-103:1-2, 11/10/2021 TR 11-10, 84-85)[3]; Rep. Tr. Bryant, Vol. 1, 135:11-136:22; Skalak (11/15/2021 TR 91:10-92:4). Additionally, customers acknowledged providing the suppliers with detailed pricing guidance about their prices relative to their competitors' prices. *See, e.g.,* Ledford (11/9/2021 TR 103:9-25, 144:21-146:5); Smith (11/8/2021 TR 91:18-93:15); Brink (11/17/2021

---

[2] *See* Rep. Tr. Bryant (official reporter's transcript) Vol 1 17:14-19; 46:21-24. *See also infra* Sections III.B.ii.b; VI.

[3] References to TR are to unofficial draft transcripts of testimony with respect to which, of course, Mr. Kantola defers to the Court's recollection.

5

TR 22:14-25). Without more, there is no reasonable basis to infer that a reference to competitor information necessarily came from a competitor, or that such information was exchanged pursuant to an agreement to fix prices or rig bids. The evidence shows that the suppliers made their own independent pricing determinations, guided by feedback from the customers and the market conditions in any given year, and that Koch repeatedly undercut its competitors.

### B. FAILURE OF PROOF THAT MR. KANTOLA KNOWINGLY JOINED AND PARTICIPATED IN THE ALLEGED AGREEMENT

There is insufficient evidence to allow a reasonable juror to find that Mr. Kantola knowingly joined and participated in any agreement to fix prices or rig bids, much less knowingly joined the seven-year plus conspiracy alleged by the Government. There was no evidence or even a reasonable inference that Mr. Kantola exchanged future pricing information with competitors,[4] or that he received assurances of what other suppliers would do. Instead, the evidence showed that Mr. Kantola consistently sought additional business and repeatedly, directly, and successfully undercut those same competitors with whom he is alleged to have engaged in price-fixing.

### i. THE MAJORITY OF THE EVIDENCE IS SILENT CONCERNING MR. KANTOLA

The evidence showed that Mr. Kantola was completely disconnected from the majority of the episodes alleged by the Government. Of the nine fact witnesses who testified at trial, five testified unequivocally that either they did not know Mr. Kantola or never dealt with him regarding the matters of their testimony: Olson (10/27/2021, TR 212:13-15); Smith (11/8/2021, TR 133:1-8); Skalak (11/15/2021, TR 100:4-14); Brink (11/17/2021, TR 131:2-8); and Hoyt

---

[4] Ex.6047 is not to the contrary. Period pricing was set by contract. Even if Mr. Kantola had expectations about the effect feed and grain purchases would have on a supplier's period pricing, this would not be evidence of an agreement about future pricing. *See* Ledford (11/9/21, TR 102:13-25).

6

(11/22/2021, TR 129:13-23). Likewise, the vast majority of exhibits admitted by the Government had nothing to do with Mr. Kantola. There is insufficient evidence to support a finding that Mr. Kantola joined and participated in the vast conspiracy alleged by the Government.[5]

      ii.    **THE EVIDENCE RELATED TO MR. KANTOLA FAILED TO SHOW HE KNOWINGLY JOINED OR PARTICIPATED IN THE ALLEGED CONSPIRACY**

The evidence related to Mr. Kantola is largely limited to negotiations in 2012, 2014, and 2017 for KFC supply.[6] The Government relied heavily on the testimony of Mr. Bryant, even though Mr. Bryant testified that he has never spoken with Mr. Kantola about prices, Rep. Tr. Bryant, Vol. 2, 378:15-17; the uncontroverted evidence established that the one time Mr. Bryant *believed* he received information about Koch's future pricing, the information was inaccurate and did not actually reflect Koch's future pricing; and, contrary to Mr. Bryant's understanding that competitors would not undercut each other, Koch did just that.

The Government also relied on phone calls (the substance of which the jury did not and will not hear) between Mr. Kantola and competitors, and inaccurate information contained in competitors' internal communications about Koch's bid price or negotiation strategy in 2012 and

---

[5] The Government has failed before in this Circuit to prove that a defendant "agreed to participate in a conspiracy of such extensive scope as the one charged." *United States v. Evans*, 970 F.2d 663, 673 (10th Cir. 1992). Like this case, the Government in *Evans* "made a tactical decision to charge [many] defendants . . . with involvement only in a single large conspiracy, rather than a series of separate smaller conspiracies"—a tactic "fraught with the potential for abuse." *Id.* at 674. As in *Evans*, the Government here "is hoisted with its own petard[,]" with a total absence of evidence that Mr. Kantola intended to join the alleged global conspiracy. *Id.*

[6] Through exhibits (and no testimony), the Government also made fleeting reference to freezing costs and quality assurance policies for Church's and Koch's attempt to seek a better price from KFC for dark meat in 2013. *See* Exs. 1-1, 2-1, 1409. Nothing about these topics evidences a price-fixing agreement involving Mr. Kantola. With regard to the freezing charge, the Government points only to a 50-second call between Tyson's Carl Pepper and Koch's main office number as its link to Mr. Kantola. Ex. 143. Regarding the quality assurance policies, there is no evidence of any discussion between Mr. Kantola and other suppliers. Ex. 2-1. The attempt for a better price was swiftly rescinded. Ex. F-808. Thus, the Government failed to show how any of these could even potentially support an inference of coordination or agreement.

2014 to stack inferences to *imply* Mr. Kantola's participation in the alleged conspiracy. Government witnesses testified that neither Mr. Kantola nor his callers possessed authority to set prices for KFC.[7] Competitors' knowledge of *inaccurate* information about Koch's future pricing or negotiation strategies cannot support any reasonable inference that he shared competitively sensitive information with his competitors, nor is it sufficient to support a finding that Mr. Kantola joined and participated in the alleged conspiracy or that one even existed.

### a.   2017 KFC NEGOTIATIONS

Mr. Bryant testified that, in January 2017, Pilgrim's began negotiations with RSCS for a 2018-2020 supply contract, Rep. Tr. Bryant, Vol. 1, 80:12; that Pilgrim's first round bid was due to RSCS the first week of February 2017, *Id.* Vol. *1* 89:21; and that sometime between January 27 and February 3, 2017, he asked Mr. Austin to find out what the other competitors' bids would be so that Pilgrim's could use the information to come up with its own price, *Id*. Vol. 1 99:7-100:14, 119:22-121:11. He further testified that during the first week of February, Mr. Austin called and gave Mr. Bryant what he *believed* to be each competitor's future price, *Id.* Vol. 1101:23-103:20, 121:1-11, 125:12-15; Vol. 2, 271:1-7, 274:25-275:11; that Mr. Bryant recorded those prices, including Koch's ($1.0125 for 8-piece FOB), in his notebook; and that Mr. Bryant then used that information to formulate Pilgrim's bid. *Id.* Vol. 1, 121:1-11, 125:2-23; Ex. 1919. Ms. Sara Fisher, an RSCS employee with responsibility for the 2017 negotiations with Mr. Kantola, testified, and Koch's bid submissions show, that the $1.0125 price Mr. Bryant received from Mr. Austin was *not* Koch's bid at any point during the 2017 negotiations. *See* Fisher (11/4/2021 TR 170:18-23, 191:15; 11/5/2021 TR 34:3-7, 34:8-13, 34:24-35, 35:6-13, 36:17-21, 37:9-20); Exs. C-465, C-265, C-207, and 18-2). Accordingly, there is no evidence to support a

---

[7] *See* Ledford 11/10/2021 TR 113:8-114:15; 166:3-11; Bryant Rep. Tr. Vol. 1, 28:25- 29;7; Vol. 2, 228:4-18; Lewis 11/3/2021 TR 180:6-16.

reasonable inference that Mr. Kantola and Mr. Austin exchanged future price information with each other in 2017.[8]

### b.   2014 KFC NEGOTIATIONS

Mr. Bryant testified that the other basis for his understanding that Mr. Kantola participated in the alleged price-fixing conduct was a call he overheard between Mr. Austin and Mr. Kantola during the 2014 negotiations for the next KFC supply contract. Rep. Tr. Bryant, Vol. 1, 44:11-21. Specifically, Mr. Bryant testified that, following Pilgrim's submission of its round one bid to RSCS, he overheard two phone calls in which Mr. Austin said something to the effect of, "I told them the price is the price. I just need to know how many loads they want at that price." *Id.* Vol. 2, 213:15-214:16, 240:7-244:6. Mr. Austin told Mr. Bryant the phone calls were with Mr. Kantola and Mr. Brady. *Id.* Mr. Bryant further testified that Mr. Austin did *not* ask either Mr. Kantola or Mr. Brady to agree with him on anything during those calls and that he did not hear anything that Mr. Kantola may have said during the call. *Id.* Vol. 2, 244:12-245:1. Mr. Bryant did *not* testify that Mr. Austin ever said that he had an agreement with competitors to fix prices. Even considering this evidence in the light most favorable to the Government, and without making any determinations about Mr. Bryant's credibility, Mr. Bryant's testimony against Mr. Kantola is insufficient to support an inference that Mr. Kantola joined or participated in the alleged conspiracy. No reasonable jury could convict Mr. Kantola based on Mr. Bryant's testimony of what he heard, especially when Mr. Austin's part of the conversation did not evidence a criminal conspiracy. The law does not permit criminal convictions based solely on the

---

[8] Mr. Bryant also testified that it was his *understanding* that Mr. Austin shared Pilgrim's future pricing information with Pilgrim's competitors and that competitors used that information to formulate their own bids and would not go after another's volume, Rep. Tr. Bryant, Vol. 1, 21:16-25; 103:21-104:8, but there is no evidence that Mr. Austin ever shared such information with Mr. Kantola, much less that Mr. Kantola used such information to determine Koch's bid or price. And Koch directly took volume from Pilgrim's. Lewis (11/4/2021 TR 127:1-9).

speculation and conjecture the jury would need to indulge in to convict Mr. Kantola on this evidence.

The Government also pointed to phone calls of unknown substance and documentary evidence to *imply* an agreement between Mr. Kantola and competitors in 2014. In particular, the Government pointed to an August 18, 2014 phone call between Mr. Kantola and Mr. Little (who did not handle Pilgrim's KFC account—*see id.* Vol. 1, 29:5-7), and an internal Pilgrim's email that indicated Koch's bid would be an increase of $.14 - .16/lb. Ex. 8-1. However, the Government established that Koch's price was only an increase of $.115/lb compared to the prior year's contract price. Ex. 10-4 (Its initial bid was only a $.13 increase. *See* Ex.1122 and 10-4). The Government also pointed to phone calls between Mr. Kantola and Mr. Brady on August 16 and September 3, 2014 and internal Claxton text messages on the same days in which Mr. Brady claimed Koch and "Bill" were "not moving." Ex. 10-2 and 10-3. Yet, this information reported by Mr. Brady, whatever its source, is wrong. Mr. Robert Lewis, an RSCS employee and principal player in the 2014 negotiations, testified that, like its competitors, Koch *negotiated* and *decreased* its price during the negotiations and the Government's documentary evidence confirms this. Lewis (11/3/2021, TR 203:8; 11/4/2021 TR 122:12-19); Exs. 1026 and 1123.

Competitors' alleged knowledge of *inaccurate* information about Koch's future pricing and negotiation strategy is insufficient to support an inference that Mr. Kantola joined or participated in an agreement to fix prices or rig bids. On the contrary, the evidence refutes that. Mr. Lewis testified that Koch was making substantial investments to increase supply to KFC; that Koch needed enhanced pricing to provide financial support for the investment; and that he and Mr. Kantola worked together on a specific proposal for Koch's Chattanooga facility to supply additional product. Lewis (11/4/2021, TR 118:15-21, 120:16-121:23, 124:3-10). The

Government's chart comparing suppliers' 2014 and 2015 pricing showed Koch was the second *lowest* priced supplier in 2015 (lower than Pilgrim's). Ex 10-4. Mr. Lewis also testified that Koch substantially *increased* its volume from 2014 to 2015, while Pilgrim's *lost* an almost equal amount of volume. Lewis (11/4/2021 TR 127:1-9). The evidence is clear: Mr. Kantola and Koch made their own independent business decisions and aggressively competed during the 2014 negotiations. Koch took business away from Pilgrim's, its competitor, and did not conspire with Pilgrim's.

### c.   2012 KFC NEGOTIATIONS

Not a single witness testified to participation in or knowledge of an agreement to fix prices or rig bids during the 2012 negotiations for KFC supply for 2013. Instead, the Government relied on documentary evidence that, once again, contains inaccurate information about Koch's future pricing and called for unsupported speculation. In Ex. 14-3, the Government excerpted a portion of an internal Pilgrim's email dated November 28, 2012, in which Mr. Austin says, "I will also be having some other discussions today to get the pulse." The Government then points to a call from Mr. Austin to Mr. Kantola on the same day, and an internal Pilgrim's email and spreadsheet dated November 29, 2012, that lists "8 Piece Price Quotes" for a number of competitors, including Koch at $0.9561. Exs. 14-3. Mr. Michael Ledford, the lead negotiator for RSCS in 2013, testified, however, that neither Koch's bid nor its final agreed contract price was $0.9561, and documentary evidence confirms that this was not Koch's bid at any time during the 2012 negotiations. Ledford (11/10/2021, TR 162:6-25); Exs. 9691, F-769, and F-808 (slide 16, showing that Koch's bids in Rounds 1-3 were not $0.9561).

### C. FAILURE OF PROOF ON MR. KANTOLA'S INTENT TO UNREASONABLY RESTRAIN TRADE

The Government was required to provide proof from which a reasonable jury could find beyond a reasonable doubt that Mr. Kantola intended to unreasonably restrain trade. The Government failed to meet its burden. The evidence established that Mr. Kantola's intent was to grow sales volume for Koch, and his negotiating efforts were consistent with that understanding.

### D. FAILURE OF PROOF ON ELEMENT OF UNDUE RESTRAINT ON TRADE AND ABSENCE OF BASIS TO APPLY *PER SE* PRESUMPTION

The Government, apart from using labels, did not even attempt to satisfy the element that a restraint of trade must be "unreasonable" or "undue," relying instead upon a *per se* presumption. Yet, the evidence at trial showed, at most, information exchanges. As a matter of law, information exchanges are judged by the rule of reason. *Gypsum*, 438 U.S. at 441 n.16 (*per se* presumption did not apply when the Government only proved an agreement to exchange information).

### E. FAILURE OF PROOF THAT MR. KANTOLA'S ALLEGED CONDUCT WAS WITHIN THE STATUTE OF LIMITATIONS

The vast bulk of the trial evidence predated October 6, 2015, the statutory timeframe for Mr. Kantola. It would have been obvious to competitors before October 6, 2015 that Mr. Kantola successfully competed to undercut them,[9] constituting evidence of withdrawal (if there had been any evidence of his involvement in the alleged conspiracy to begin with).[10] Additionally, there was no evidence from which a reasonable jury could find that Mr. Kantola engaged in any conspiratorial conduct within the statutory time period or that Pilgrim's prices, or those of the

---

[9] *See supra* Section III.B.ii.b. *See also* Brink (11/17/2021, TR 131:9-15 (Koch came in to Pollo Tropical in 2016 and took sales volume that otherwise would have gone to the prior incumbents or other suppliers)).

[10] Withdrawal can be by conduct inconsistent with the objectives of the alleged conspiracy, including resumption of competition. *Gypsum*, 438 U.S. at 464-65.

other suppliers, were artificially inflated as a result of any agreement. Thus, even the argument that continuing receipt of payments continues a conspiracy, does not apply.[11]

## IV. IMPROPER VARIANCE WITH INDICTMENT

"A variance arises when the evidence adduced at trial establishes facts different from those alleged in [the] indictment." *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995). When "a single conspiracy is charged in the indictment, [but] the government proves only multiple conspiracies, a defendant who suffers substantial prejudice must have his conviction reversed." *Id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 773-74 (1946)).[12] Such a "conspiracy variance" occurs when there is insufficient evidence supporting a jury's finding "that *each* defendant was a member of the *same* conspiracy"—i.e., "that *each* [alleged] co-conspirator must have a shared criminal objective, not just similar or parallel objectives between similarly situated people." *Hill*, 786 F.3d at 1266 (emphases added). A single, global conspiracy requires interdependence among all of the alleged co-conspirators. *See Edwards*, 69 F.3d at 432. This means that the "[G]overnment must prove that the coconspirators intended to act together for their shared mutual benefit within the scope of the conspiracy charged, [and that] each co-conspirator's activities constituted ***essential and integral steps*** toward the realization of a common, illicit goal." *United States v. Cushing*, 10 F.4th 1055, 1066 (10th Cir. 2021) (internal citations omitted) (emphasis added).

---

[11] *See United States v. Kissel*, 218 U.S. 601, 607-08 (1910) (Sherman Act conspiracy continues until abandonment or success, but mere continuance of the result of a crime does not continue the crime); *United States v. Evans & Assoc. Constr. Co.*, 839 F.2d 656, 661 (10th Cir. 1988) (receipt of payments can continue a conspiracy if at non-competitive levels).

[12] "The government has the power to define the scope of the conspiracy as broadly as it thinks the facts will justify, but if it fails to prove the conspiracy as charged, it will fail to obtain a conviction. And, if the government is nevertheless able to persuade a jury to convict a defendant on evidence that does not prove the large conspiracy and connect the defendant to it, the district judge and the appellate courts are obligated to reverse that conviction." *Evans*, 970 F.2d at 674 n.13 (emphasis added).

Here, the Government failed to prove *any* conspiracy, but—at best—its evidence attempted to prove *multiple* conspiracies. The Government's proffered evidence went to separate and distinct incidents and alleged agreements, each allegedly involving different defendants, different products and customers, different conduct, and taking place at different time periods.[13] But there is no evidence tying Mr. Kantola to any "global conspiracy" over the course of seven years. *See Hill*, 786 F.3d at 1266-67 (finding a conspiracy variance where there was insufficient evidence to tie the defendant to "any larger conspiracy"). Further, there is no evidence that Mr. Kantola shared a criminal objective with respect to the alleged co-conspiratorial conduct for which Mr. Kantola had neither knowledge nor involvement.

This conspiratorial variance promises to substantially prejudice Mr. Kantola "by causing the jury to [weigh his] guilt by relying on evidence presented against other defendants[.]" *Hill*, 786 F.3d at 1266. Likewise, given the complex nature of the evidence and the dissimilar nature of the alleged anticompetitive conspiracies for which the Government proffered its purported evidence, it is likely that the jury will misuse evidence against Mr. Kantola.[14] *See Kotteakos*, 328 U.S. at 774 ("The dangers of transference of guilt from one to another across the line separating

---

[13] Indeed, the alleged conspiratorial actions could not constitute "essential and integral steps" toward a *common goal*, as each separate incident allegedly had *different goals*. As examples: (1) The success or failure of Sysco attaining its preferred credit terms was neither an essential nor an integral step to whether Pilgrim's would succeed with its (independent) decision to raise prices to KFC; (2) The testimony established that each year of contract negotiation rested upon the market conditions **at that specific time**, consequently driving both price increases and decreases; (3) No evidence was adduced that communications among suppliers for 2013 (if any) had any effect upon contract negotiations for 2015; and (4) No evidence has been proffered of *quid pro quo* conduct involving Mr. Kantola.

[14] Indeed, the Tenth Circuit has mandated that courts "must be particularly vigilant when the government seeks to bring many individuals under the umbrella of a single conspiracy, [as the] risk is that a jury will … fail to differentiate among particular defendants. The government must not be allowed to use conspiracy as a tool to circumvent the fundamental principle that 'guilt with us remains individual and personal.... It is not a matter of mass application.'" *Evans*, 970 F.2d at 674 (quoting *Kotteakos,* 328 U.S. at 772).

conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place.") Accordingly, the Court should enter a judgment of acquittal because of the variance and its resulting prejudice to Mr. Kantola.

## V. CONSTITUTIONAL INFIRMITY OF THE PROSECUTION

The trial testimony demonstrated that the application of the Sherman Act in this case is unconstitutional under the void-for-vagueness doctrine, which requires that a person must know what conduct may bring punishment. *See Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391-93 (1926); *Skilling v. United States*, 561 U.S. 358, 402-03 (2010). The Government's evidence in this case proved that ordinary people were unable to understand what constitutes a violation of the Sherman Act. Rep. Tr. Bryant, Vol. 2, 235:8-24, 226:6-15 (no agreement, and information exchange used to independently formulate own bids, but government led him to understand the conduct was "price fixing").

## VI. CONCLUSION

For the foregoing reasons, Defendant Kantola respectfully requests the Court pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure to enter a judgment of acquittal.

Dated:  November 29, 2021

Respectfully submitted,

JAMES A. BACKSTROM, COUNSELLOR

ROXANN E. HENRY, ESQ.
5410 Wilson Lane
Bethesda, MD 20814-1342
Tel: (202) 489-9556
Henry.Roxann@me.com

*s/ James A. Backstrom*

1515 Market Street, Suite 1200
Philadelphia, PA 19102-1932
(215) 864-7797
jabber@backstromlaw.com

*Counsel for Defendant William Kantola*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of November, 2021, I filed the foregoing **Defendant William Kantola's Memorandum in Support of Motion for Judgment of Acquittal** with the Clerk of Court using the CM/ECF system, which will serve notice of such filing on all counsel of record.

At:   Philadelphia, Pennsylvania               *s/ James A. Backstrom*
                                               James A. Backstrom